# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TOMOKO FUNAYAMA,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-5599** |
| | : | |
| **NICHIA AMERICA** | : | |
| **CORPORATION, et al** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                    **April   13,   2011**

Plaintiff Tomoko Funayama alleges that defendants Nichia America Corporation and its President, Shigeo Kuboniwa, are liable for discrimination, retaliation, a hostile work environment, and constructive discharge.  The parties have filed cross motions for summary judgment.  Because defendants have established that there is no genuine factual dispute and that they are entitled to judgment as a matter of law, their motion is granted.  Ms. Funayama's motion is denied.

## CROSS MOTIONS FOR SUMMARY JUDGMENT

## I.      BACKGROUND

Ms. Funayama is a woman of Japanese descent and is over forty years old.  Am. Compl. Doc. No. 5, ¶ 10.  She was hired by defendant Nichia America in 1995, to work in its offices in Mountville, Pennsylvania, as a Business Coordinator/Accountant.  Id. ¶ 8.  She was promoted to

Assistant Financial Manager in January 1998 and to Financial Manager in January 2004. Id. ¶ 9.

She contends, among other things, that she was subject to pervasive harassment in the form of

comments, physical touching, and other actions at the hands of Nichia's President, Mr.

Kuboniwa. Ms. Funayama's remaining claims stem from Nichia's decision to close its office in

Mountville and consolidate its operations in Detroit, Michigan. Specifically, Ms. Funayama

claims that the company discriminated against her on the basis of her gender, age, and national

origin when it initially decided not to include her in the transition to Detroit and then demoted

her by offering her an undesirable position there.

### A.     Procedural History

On February 17, 2009, while represented by counsel, Ms. Funayama filed an amended

complaint containing fifteen counts against the defendants. This Court granted the defendants'

motion to dismiss Count I of Ms. Funayama's amended complaint asserting a cause of action

under Section 1981 and denied the motion as to the remaining counts. The following counts

remain: Count II alleging retaliation in violation of 42 U.S.C. § 1981; Counts III and IV alleging

gender discrimination in violation of Title VII of the Civil Rights Act ("Title VII") and the

Pennsylvania Human Relations Act ("PHRA"); Counts V and VI alleging age discrimination in

violation of the Age Discrimination in Employment Act ("ADEA") and PHRA; Counts VII and

VIII alleging race and national origin discrimination in violation of Title VII and the PHRA;

Counts IX - XII alleging retaliation in violation of Title VII, the PHRA, and the ADEA; Counts

XIII and XIV alleging sexual harassment in violation of Title VII and the PHRA; and Count XV

alleging a violation of the PHRA against Shigeo Kuboniwa.

After the discovery period began and approximately two weeks before the discovery period was set to end, Ms. Funayama's attorney filed a motion to withdraw as counsel on October 13, 2009. See Doc. No. 20. That motion ultimately was granted on March 3, 2010, after repeated attempts to schedule and hold a settlement conference before United States Magistrate Judge Henry S. Perkin prior to the final withdrawal of Ms. Funayama's attorney. Ms. Funayama represented to the Court that she was attempting to obtain new counsel.

On March 3, 2010, this Court issued an order that Ms. Funayama could continue to seek new counsel, and noting that the case would proceed while she represented herself *pro se.* This Court set dispositive motion deadlines for the parties, in recognition of the fact that discovery should have been substantially complete prior to the date upon which Ms. Funayama's former attorney filed a motion to withdraw. The defendants failed to file a motion for summary judgment by the set deadline, but Ms. Funayama filed a number of motions, including a motion to re-open her Section 1981 complaint, a motion to amend her complaint to add delivery of adult sexual material, a motion for a preliminary hearing on her adult sexual material allegation, a motion for a new Rule 16 conference, and a motion to re-open the discovery period. See Doc. Nos. 39, 40, 41, 43, 44. Ms. Funayama's motions were referred to Magistrate Judge Perkin, who issued a Report and Recommendation resolving the motions. See Doc. No. 57. After a *de novo* review of Ms. Funayama's motions, defendants' responses, Magistrate Judge Perkin's Report and Recommendation, and Ms. Funayama's objections to Judge Perkin's R&R, this Court adopted the R&R and, pursuant to Ms. Funayama's request, re-opened the discovery period in her case and re-set the deadline for the parties to file summary judgment motions pursuant to Federal Rule of Civil Procedure 56. See Doc. No. 59.

Ms. Funayama engaged in ample discovery, deposing numerous Nichia employees. Both parties filed motions for summary judgment, which are now before the Court. Ms. Funayama also has filed numerous motions for reconsideration of this Court's order denying her second motion to amend her complaint, which was filed after the re-opened discovery period ended. See Doc. Nos. 95, 98. Defendants have filed a motion to strike exhibits Ms. Funayama submitted with her motion for summary judgment but did not produce during discovery. See Doc. Nos. 92, 94.

**B.      Hostile Work Environment Allegations**

During her deposition, Ms. Funayama was questioned at length about the sexual harassment allegations set forth in her complaint, many of which took place between 1999 and 2003. Ms. Funayama affirmed that, other than the instances set forth in her amended complaint and explained during her deposition, she was not harassed by Mr. Kuboniwa at any other time. Funayama Dep. 217:1-4, Sep. 15, 2009. Therefore, because Ms. Funayama has confirmed that no other outstanding incidents remain, the facts supporting her harassment allegations, as divulged during discovery and viewed in the light most favorable to her, are as follows:

In 1999, Ms. Funayama visited Mr. Kuboniwa's house to look at furniture he was discarding to see if she could use any of it. Funayama Dep. 217:7-19. After she arrived, she stayed for dinner, and after dinner, they went to an inn for a drink. Id. at 218: 1-5. When Mr. Kuboniwa later took her home, he grabbed her breast, kissed her, and asked if he could come to

her apartment.[1]  See id. at 217-220.  She said no and he left.  Id. at 220:20-24.  The following

Monday at work, Ms. Funayama spoke with Mr. Kuboniwa and explained that she wanted to

maintain a professional relationship.  Id. at 221:17-25.  He said okay.  Id. at 222:1-2.

During a business trip in 2001, Mr. Kuboniwa suggested that, although two rooms had

been reserved for he and Ms. Funayama, they share one room instead.  Funayama Dep. 224:10-

15.  When Ms. Funayama responded that two rooms would be better, he agreed.  Id. at 224:17-

19.  He did not proposition her for sex or say anything else at that time.  Id. at 224:16-24.

In 2003, Mr. Kuboniwa gave Ms. Funayama a Japanese novel that, according to the

complaint, she found sexually explicit and erotic.  Am. Compl. ¶ 20.  She and Mr. Kuboniwa

often had friendly small talk following business-related conversations.  Funayama Dep. at

227:19-228:1.  That small talk sometimes led to talk about literature, and Mr. Kuboniwa gave

Ms. Funayama literature on at least one other occasion.  See id. at 225:24-226:15.  Also in 2003,

Ms. Funayama went to Mr. Kuboniwa's apartment to deliver medicine to him after he had an

operation.  Id. at 228:19-25; Am. Compl. ¶ 21.  She considered this a personal favor.  Funayama

Dep. at 231:11-12.  When she arrived, Mr. Kuboniwa was lying in his bed, but got out of bed to

take the medicine.  Id. at 230:5-13.  When he did, Ms. Funayama realized that he was only

---

[1]  I note that, in her response to defendants' motion, Ms. Funayama describes this incident as "a forced kiss and assault and battery of Funayama who forcefully rejected his attack." Funayama Resp. To Def.'s Mot. For Summary J. ("Funayama Resp."), 5.  There is absolutely no basis for this characterization in the record.  In her own deposition, Ms. Funayama stated that when Mr. Kuboniwa grabbed her breast on this occasion, she "didn't push him back or [say] what are you doing or anything like that.  I was surprised but I still felt very awkward and at the same time I felt it was inappropriate for me to make him realize he did something inappropriate." Funayama Dep. 218:10-14.  She confirmed when asked again that she didn't say anything to Kuboniwa at the time.  Id. at 218:15-17.  Ms. Funayama's description of this event in her memorandum lacks any basis even under her own version of the facts.

-5-

wearing his underwear.  Id. at 230:15-16.  Ms. Funayama did not claim that Mr. Kuboniwa made

any advances or inappropriate comments at this time.

A third allegedly harassing incident took place in 2003, when Ms. Funayama attended a

dinner meeting with Mr. Kuboniwa, Tobura Tazaki, a Nichia executive visiting from Japan, and

some other managers.  Am. Compl. ¶ 23.  They went to a Hooters restaurant, which Ms.

Funayama found inappropriate.  Id.  She was told that she did not have to attend the meeting, but

chose to attend anyway so that she could "network" with Mr. Tazaki.  Id.  She did not claim that

any sexual comments were directed at her during the dinner at Hooters, but did claim that the

men present made comments about the waitresses' bodies in Japanese.

Although her complaint alleges that beginning in 1999 Mr. Kuboniwa regularly asked if

he could come to her apartment, Ms. Funayama testified during her deposition that he stopped

making this request in 2003.  Funayama Dep., 222:14-19.  She explained that after Mr.

Kuboniwa asked her to dinner at some point in 2003, she sought the help of Debbie Masinos, a

human resources representative at Nichia.  Id. at 203:19-204:4; 222:14-19.  Ms. Masinos

suggested that Ms. Funayama clearly decline the invitation and later heard from Ms. Funayama

that this response had been accepted well by Mr. Kuboniwa.  See id.; Nichia Exs. V and W

(Masinos Memo. To Funayama re: Kuboniwa; Funayama Email Resp. To Masinos Memo.).  Ms.

Funayama explained that Mr. Kuboniwa "stopped asking me to do something alone with him

right after I said no to that dinner invitation[.]"  Funayama Dep. 222:16-18.[2]

---

[2]  It is clear that Ms. Funayama did not mean to say that Mr. Kuboniwa only temporarily
stopped inviting himself to her apartment at this point.  Rather, when asked if he stopped inviting
himself over in 2004 because Ms. Funayama moved out of her apartment in 2004, she again
confirmed that he had stopped making the requests in 2003 and then continued to answer
questions about his invitations assuming they had taken place "in that 1999 to 2003 period."  See

The next specific incident of harassment, as set forth in the complaint, took place in 2006, when Mr. Kuboniwa allegedly told Ms. Funayama that he found it hideous that she was becoming Americanized. Am. Compl. ¶ 15. Then, in November 2007, Ms. Funayama submitted an Employee Self-Assessment evaluation on which she stated that one of her accomplishments was improving the balance between her work and personal life. Id. ¶ 29. Another supervisor at Nichia, Tim Ujike, told her that this "was an inappropriate remark or accomplishment." Id. The same month, Mr. Kuboniwa "reprimanded" Ms. Funayama for bringing her daughter to Nichia's office Christmas party.[3] Funayama Dep. 177:25-178:2. Ms. Funayama found this hurtful and did not feel that Mr. Ujike responded with sufficient concern when she reported the incident to him. Id. at 178:4-10. She did not tell Mr. Ujike that she believed Mr. Kuboniwa's reprimand was motivated by her age or gender. Id. at 182:22-25. Finally, on May 8, 2008, while at work, Mr. Kuboniwa asked Ms. Funayama if she was cold. Am. Compl. ¶ 39. Ms. Funayama responded that she wasn't cold because she had gained ten pounds in the last year. Id. Mr. Kuboniwa said that Ms. Funayama was still nice and slim and then stated "that he would not feel a woman was sexy unless the woman's body was like hers." Id.

With respect to her allegation that Mr. Kuboniwa "groped [her] breasts, or near her breasts, on a regular basis" from 2003 until the end of her employment in July of 2008, Ms.

_____

Funayama Dep. 222:10-223:2.

[3] In her response to defendants' motion for summary judgment, Ms. Funayama states that Mr. Kuboniwa "violently threatened [Ms.] Funayama regarding his satisfaction with the event." Funayama Resp., 9. This statement has no basis in fact. In her complaint, Ms. Funayama alleged that Mr. Kuboniwa "berated" her, and in her deposition, she stated that he "reprimanded" her. Nowhere in her complaint or in her deposition does she alleges that Mr. Kuboniwa was violent to her during this incident.

Funayama was asked why she did not approach a supervisor about this issue, as she had when Mr. Kuboniwa asked her out to dinner. <u>See</u> Funayama Dep. 204:5-20. She stated that, "I thought I could live with it if Mr. Kuboniwa didn't ask me out." <u>Id.</u> at 204:19-20. She explained that she would not have been able to live with the groping if it was "more obvious" or if he had "grabbed [her] breast." <u>Id.</u> at 204:21-205:6. She affirmed that if he had grabbed her breast, she would have reported it. <u>Id.</u> at 205:9-11. Instead, Ms. Funayama explained that Mr. Kuboniwa would touch her starting at her shoulder and move down her back to the area between her back and her breast. <u>Id.</u> at 206:10-207:1. She believed Mr. Kuboniwa engaged in this type of touching for some sort of sexual thrill, but she never told him to stop. <u>Id.</u> at 208:15-21; 209:5-9.

In addition to the Japanese novel Mr. Kuboniwa gave her in 2003, Ms. Funayama claims he gave her more sexually explicit material in November of 2007. The magazine Mr. Kuboniwa gave Ms. Funayama on this occasion, "Shukanshincho," was described by her as a popular weekly Japanese magazine containing general content on political, economic, and society issues, novels, jokes, and "Hollywood type" tabloid materials. Funayama Dep. 28:20-29:10; 231:20-25; Funayama Resp., 5. Ms. Funayama claims the particular issue she received contained an "illustration of a naked woman bending over predominantly showing the vagina and a woman's mouth holding a penis[.]" Funayama Resp., 5. She provides a copy of the page of the magazine, which includes a rough illustration of a woman with exposed genitalia; the drawing is so inexact that there is no basis upon which a viewer could conclude that the woman is holding anything in her mouth, much less a penis. <u>See</u> Funayama Ex. 1D.

Ms. Funayama stated during her deposition testimony that the sexual harassment she allegedly experienced was not the reason she resigned from her position in July of 2008.

| | |
|---|---|
| Q: | If I asked you why did you resign from Nichia, you would tell me that you resigned because you believed you were being discriminated against? |
| A: | Yes. |
| Q: | And because you believed that you were being sexually harassed, right? |
| A: | That was not the reason for resignation. Sexual harassment was not the reason for resignation. |
| Q: | I see. Just the discrimination on the basis that you were Japanese and a woman? |
| A: | Yes. And there was no future in Nichia, as I understood, by looking at my new job description. Why would I liquidate things in Lancaster, even temporarily liquidate something to go to Detriot, something that I know that I'm not going to be happy and satisfied. That seems like a dumb move. |

Funayama Dep. 188:19-189:9.


### C.     Disparate Treatment, Retaliation, and Constructive Discharge Allegations

The allegations with respect to Ms. Funayama's position following Nichia's decision to move its operations from Mountville to Detroit are as follows: on May 7, 2008, she was told a decision had been made to not relocate her to Detroit, and that she would be terminated when the transfer was complete. Am. Compl. ¶ 35. Her position would be filled by Brian Marshall, an Assistant Financial Manager who reported to Ms. Funayama. Id. Marshall is a Caucasian male in his twenties who had only three years of accounting experience at that time. Id. ¶ 37. By comparison, Ms. Funayama had thirteen years of experience at Nichia, was "regarded as one of its key employees," and had an "excellent" performance record. Id. ¶ 41. Mr. Kuboniwa said that he and another Nichia executive "did not want any Japanese in the Detroit Accounting Department." Id. ¶ 36. On May 7, 2008, Mr. Kuboniwa said that "if there were any help needed in the Detroit accounting department that [Nichia's parent corporation in Japan] would send a

young male Japanese person from Japan to help out." Id. ¶ 40. On May 28, 2008, Ms. Funayama filed a complaint with the Pennsylvania Human Relations Commission alleging discrimination on the basis of gender, age, and national origin. On the same day, Ms. Funayama met with Mr. Kuboniwa and was told Mr. Ujike would be resigning on August 14, 2008. Id. ¶ 43. Instead of losing her job, Ms. Funayama would be kept on for the transition to Detroit, but was not told what her duties or responsibilities would be. Id. ¶¶ 43–44. On June 25, 2008, Ms. Funayama met with Mr. Kuboniwa, Mr. Ujike, and Mr. Marshall. She was told that Mr. Marshall would be promoted to Mr. Ujike's position, and understood that she would be reassigned from her position as financial manager to a non-managerial clerical position. Id. at ¶ 45. She viewed this to be a demotion. Id. On June 26, 2008, Mr. Ujike encouraged Ms. Funayama to look at a "career change" website and told her the Detroit managers "did not like her and . . . were troubled that she had been offered a position in Detroit." Id. ¶ 46. On June 27, 2008, Mr. Kuboniwa told her the company had been notified by the EEOC regarding her complaint and they "didn't know what to do with her." Id. ¶ 47. On July 1, 2008, Ms. Funayama filed a charge of retaliatory discrimination with the PHRC and the EEOC, and resigned from her employment on July 28, 2008. Id. ¶ 48.

The evidence created during discovery reveals a very different set of facts. Nichia's move to Detroit was necessitated by a decline in business at its Mountville plant. Funayama Dep. 163:22-164:8. In 2008, a directive came from Nichia's parent company in Japan to close the Mountville plant and move Nichia's administration to Detroit. Id. at 164:19-24. Ms. Funayama estimated that while over fifty workers were employed at Nichia's Mountville location in 2002, that number had dropped to approximately twenty by 2008. Id. at 144:21-24. Ms.

Funayama later estimated that almost twenty jobs would be lost as a result of the consolidation. Id. at 167:17-21. Mr. Kuboniwa told her on May 7, 2008 that the company did not plan to transfer her to Detroit, and at that time, she did not know what was going to happen to the other employees in the accounting department, including Brian Marshall. Id. at 169:12-170:7. Ms. Funayama believed at that time that Mr. Ujike was to go back to Japan. Id. at 169:22-24. Mr. Kuboniwa explained that as of early May, 2008, he did not have concrete plans for the makeup of the accounting department in Detroit; however, he confirmed that he told Ms. Funayama her employment would be terminated and expected Mr. Ujike to return to Japan. Shigeo Kuboniwa Deposition Session 1, 98:23-99:12, Sep. 21, 2010.

One of the key allegations of Ms. Funayama's complaint is that her position was to be given to a younger, white male, Mr. Marshall, upon the company's transfer of offices to Detroit. Although Ms. Funayama alleged in her complaint that she was told in May of 2008 that her job would be transferred to Mr. Marshall, she explained during her deposition that she did not find out that Mr. Marshall was going to Detroit until June 25, 2008, when she attended the meeting about the Detroit transfer with Mr. Kuboniwa, Mr. Ujike, and Mr. Marshall. Funayama Dep. at 170:3-14. During the time the transition was being planned, Mr. Kuboniwa planned to transfer only three members from Nichia's Accounting Department in Mountville to Detroit. Kuboniwa Dep. Session 1, 99:17-100:12. Mr. Kuboniwa later clarified that he planned for Mr. Ujike to handle some of the transition work upon the company's move to Detroit because of Mr. Ujike's ability to speak Japanese, his stronger relationship with Nichia Japan, and his broader knowledge base. Id. at 99:21-100:9; 114: 23-115:1. Nichia also has presented evidence that, unlike Ms. Funayama, Mr. Ujike was a licensed accountant. See Nichia Ex. K.

However, later in May of 2008, Mr. Ujike resigned from his position with Nichia, making himself unavailable for transfer to Detroit.  See Kuboniwa Dep. Session 1, 103:24-105:8.  After Nichia learned of his resignation, Mr. Kuboniwa offered Ms. Funayama a position in Detroit working in the Accounting Department that would be set up there.  See id. at 105:5-16; 106:23-107:4; Funayama Dep. 103:5-8.  In Ms. Funayama's words, "that meant that I was now going to Detroit for some sort of accounting position, unknown, and moving arrangements that the company would support was unknown.  Title was unknown.  Compensation was unknown." Funayama Dep. at 103:8-12.  Mr. Kuboniwa affirmed that when he offered Ms. Funayama the position in Detroit in place of Ujike, he did not know who else would remain in the Accounting Department, and did not know how the Department would be structured.  Kuboniwa Dep. Session 1, 107:1-4.

Ms. Funayama was unsatisfied with not knowing the nature of the position she was offered in Detroit.  Although she asked Mr. Kuboniwa for details in late May, after she was offered a position, none were given to her until the June 25, 2008 meeting.  When questioned by Ms. Funayama about why it took him a month to come up with a schedule of duties, Mr. Kuboniwa explained that because he was planning well into Nichia's future, he needed time to consider company structure:

> Q:   Why did it take so long [to respond to my email asking about "the details of the position, salary, relocation, details?"]
> A:   Still I was considering the whole organization in the future, so I need more time.
> Q:   But you were clear on the 25th.
> A:   About accounting assignment.
> Q:   Plaintiff requested to give her the details, but you remained silent.
> A:   As I told you, when I received this email, I'm considering.  I

> understand your concern.  I told you.  But please wait, that I
> told you.

Kuboniwa Deposition Session 2, 92:6-16, Oct. 12, 2010.  At the June 25, 2008 meeting, Mr.

Kuboniwa presented an Excel spreadsheet, prepared by or with the help of Mr. Ujike, detailing

the duties Ms. Funayama and Mr. Marshall, who had also been offered a position following the

transfer, would have in Detroit.  Kuboniwa Dep. Session 2, 92:16-20.

Ms. Funayama alleges that the spreadsheet reflected that she would be relegated to

"essentially clerk type of job duties" in Detroit.  Funayama Dep. at 103:16-20.  The spreadsheet

had three columns: one describing a particular duty, one for the person assigned to that duty at

present, and the third for the person assigned to that duty "new after [Mr. Ujike's] departure."

See Job Reassignment Chart, Nichia Ex. U.  Because many of the duties held by Nichia

employees moving to Detroit were to remain the same, the space in the row designated for the

new position-holder is often blank.  See id.  By way of example, the first column in the first row

describes the duty "Payroll," the second column in that row indicates that Nichia employee Tae

Kim was assigned to payroll at the time, and the third column in that row is blank, indicating that

Ms. Kim was to continue her payroll responsibilities after the move to Detroit.  See id.  The first

time Mr. Ujike appears in the chart, he is assigned the duty of "Bank reconciliations (payroll),"

and Ms. Funayama's name appears in the third column, indicating that she would take over that

particular duty in the move to Detroit.  Id.  There are 59 duties set forth in the chart.  Seven duties

originally assigned to Mr. Ujike were to be transferred to Mr. Marshall.[4]  One duty originally

---

[4]  These duties were "approval of credit application," "approval of emergency shipment,"
"cost allocation," "cost accounting," "inventory reserve," "Impairment Test (GE Lumination),"
and "Complete NAC Financial Reporting."

assigned to Mr. Ujike was transferred to Ms. Funayama ("bank reconciliation (payroll)"), and one duty originally assigned to Ms. Funayama was transferred to Mr. Marshall ("T/B Analysis"). Two other duties, "Contact with PWC-NY" and "Contact with HQ" were originally assigned to "Tim [Ujike]/Tomoko [Funayama]" and were to be transferred to "Tomoko [Funayama]/Brian [Marshall]." Id. Ten duties originally assigned to Ms. Funayama on the chart remained hers upon the transfer to Detroit.[5] See id. During her deposition, Ms. Funayama explained that she took particular note of the fact that a duty formerly hers, monthly analysis of the trial balance sheet, was transferred to Mr. Marshall, and noted that clerical jobs she used to supervise appeared to be among her "everyday projects" in Detroit. Funayama Dep. at 237:14-238:15.

Although Ms. Funayama alleged in her complaint that she viewed the position offered to her in Detroit as a demotion, she stated during her deposition that when Mr. Ujike resigned, she initially understood that she was being asked to stay on to do the accounting work—work she had done for Nichia in Mountville—in Detroit. Funayama Dep. 106:15-25. She later testified that she believed the job offered to her in Detroit involved "setting up a new accounting department and transitioning the customer related accounting. Specifically, collections of the accounts receivable and working with the salespeople in that respect, he wanted Ujike to handle it. So he is gone. Now Brian is there but maybe he thought it was [a handful] for Brian to initially start." Funayama Dep. 108:15-21.

Mr. Kuboniwa did not testify that the work intended for Ms. Funayama in Detroit was

_____

[5] These duties were "Bank Reconciliations (Wachovia Main)," "Bank Reconciliations (BOTM-USD)," "Bank Reconciliations (BOTM-JPY)," "Liability Insurance," "Stationary Purchase," "Wire Transfer," "Chart of a/c reconciliation," "Complete HQ Consolidation Package," "Verification of Tax Return," and "Tax Payment."

transitional or clerical;  rather, he indicated that she was the one person he expected to remain in the Detroit accounting department.  <u>See</u> Kuboniwa Dep. Session 1, 106:23-107:4 (Q: When you offered [Ms. Funayama] a position in Detroit because Ujike was leaving, what would [her] position be at that time[?]" A: At that time, I didn't know who else, just I offered you.  And other members, including Brian, I didn't know whether he's going to transfer or not.  So, at that point, I have no idea.").  While Ms. Funayama was offered a position on May 28, 2008, Mr. Kuboniwa did not decide that Brian Marshall would be offered a position in Detroit until sometime in June of 2008.  <u>Id.</u> at 100:17-19.

While she was still an employee of Nichia in Mountville, Ms. Funayama was one of Mr. Marshall's supervisors.  Brian Marshall Deposition, 13:17-14:3, Sep. 20, 2010.  As set forth in detail above, the schedule of duties in Detroit reflected that Mr. Marshall and Ms. Funayama would each assume duties formerly assigned to Mr. Ujike.  During the June 25, 2008 meeting and as reflected in the chart, Mr. Marshall was under the impression that Ms. Funayama would be transferred to Detroit along with him.  <u>Id.</u> at 17:9-12.  Mr. Marshall's current position is assistant Accounting Manager.  <u>Id.</u> at 10:15-18.  He did not receive this change in title until he officially transferred to Detroit in February of 2009.  <u>Id.</u> 10:2-12.  He explained that when he initially accepted a position, he understood that he was to receive an increased salary and have some increased responsibilities, but that he would have the same title.  <u>Id.</u> at 19:18-20:2.  Mr. Marshall earned $48,000 per year while an employee of Nichia in Mountville, and earned $70,000 per year upon his transfer to Detroit.  Marshall Dep. 25:14-25.  In its responses to Ms. Funayama's interrogatories, Nichia stated that Ms. Funayama's salary would have increased from $62,000 to approximately $80,000 had she transferred to Detroit.  Funayama Ex. 21, Def.'s Resp.

To Plaintiff's First Set of Interrogatories, 7.

Nonetheless, Ms. Funayama testified that she believed she had been asked to start the transition process in the accounting department only for Mr. Marshall to ultimately take it over. Funayama Dep. 108:22-109:8. If Mr. Marshall could not do the work, she believed the company's intention was to bring a man from Nichia's parent company in Japan. Id. at 110:5-13. In support of this argument, she described a conversation she had with Mr. Kuboniwa in his car while driving him to a car dealership, during which he told her that if Mr. Marshall couldn't handle the accounting department in Detroit, a man from Nichia Japan's accounting department would be asked to come to Detroit for the position. Funayama Dep., 108:22-109:4. According to Ms. Funayama's complaint, this conversation occurred on May 8, 2008, before Mr. Ujike resigned, before Ms. Funayama was offered a position in Detroit, and before she knew that Mr. Marshall would be transferred to Detroit. Am. Compl. ¶ 39-40. She claims this statement evidenced Nichia's intent to exclude Japanese women from the company. Id. at 109:6-8.

During the time Nichia was determining the structure of the accounting department upon its move to Detroit, Ms. Funayama was pursuing other job opportunities. She posted her resume on a job placement website, monster.com, while she was still at Nichia, prior to June of 2008. Funayama Dep. 34:14-20. In response to her posting, she was contacted by a recruiter, DCM Creations, in May or June of 2008. Id. at 40:8-12. DCM put her in touch with her eventual employer, P&F USA, and she interviewed with P&F in June of 2008. Id. at 42:2-9. She verbally was offered a position with P&F in early July, 2008, and received an official offer of employment a few days later. Id. at 42:17-43:17. She accepted P&F's offer in the middle of July, 2008. Id. at 43:18-19.

Ms. Funayama was undergoing great stress during the last months of her time with

Nichia. She explained during her deposition the discussions she had with her doctor:

> A: But I was very, very stressed at that time. And I wanted to --
> wanted to do something to just get out of that situation.
> Q: You wanted to leave the company?
> A: If I could. But I didn't know what it really meant to me.
> Q: You mean you didn't know what what meant, the plans for Detroit?
> A: Yeah. Whether I should go to Detroit or just to quit. Just quit is
> probably not the choice that I wanted to make. Because I needed
> financial means. But at the time, the P&F situation was about to
> come out. So I shared that with [my doctor]. And she was very
> happy for me that I had another career path that's waiting for me. . .

Funayama Dep. 104:8-20.

Ms. Funayama filed a complaint of age, gender, and national origin discrimination with

the PHRC and the EEOC on May 28, 2008. This is the same day she was offered the position in

Detroit. Nichia would not learn of the complaint until a few days later. On July 1, 2008, Ms.

Funayama filed a charge of retaliatory discrimination with the PHRC and the EEOC, and she

resigned her employment on July 28, 2008.

During her deposition, Ms. Funayama confirmed that she received a raise each year she

worked at Nichia. Funayama Dep. at 89:19-20. She also confirmed that she received a bonus

each year she worked for Nichia. Id. at 115:20-116:10. She described one incident early in 2005

when she told Mr. Kuboniwa that she was dissatisfied with the amount her salary was to increase

from 2004 to 2005. Id. at 117:11-15. She said that when she complained to Mr. Kuboniwa, he

threatened to demote her and she reported this conversation to Mr. Ujike. Id. at 118:8-12. She

received an additional $2000 bonus as a result of her complaint. Id. at 118:14-23. She affirmed

that she was not demoted at that time. Id. at 119:2-12.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party opposing summary judgment "cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way."  El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  FED. R. CIV. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

## III.    DISCUSSION

### A.    Gender Discrimination and Hostile Work Environment Claim (Counts XIII-XV)

Ms. Funayama asserts a hostile work environment claim against Nichia under Title VII and the PHRA.[6] Her PHRA claim extends to Mr. Kuboniwa under an aiding and abetting theory. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Prior to filing an action in federal court, a plaintiff must file a timely Charge of Discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1). Under Title VII, a plaintiff ordinarily must file a charge of employment discrimination with the EEOC within 180 days of the alleged unlawful employment practice. See 42 U.S.C. § 2000e-5(e)(1). However, in a deferral state such as Pennsylvania, i.e., a state that has its own law prohibiting the practice alleged and has established or authorized a state or local authority to grant or seek relief from practices prohibited under Title VII, the employee has not 180 but 300 days from the date of the alleged unlawful employment practice in which to file his Charge of Discrimination. Id.; see also Cardenas v. Massey, 269 F.3d 251, 255 n.2 (3d Cir. 2001).

When a plaintiff alleges discrete discriminatory acts, those discrete acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges."

---

[6] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts, Title VII, the ADA, and the ADEA. See Kelly v. Drexel Univ., 94 F.3d 102, 104 (3d Cir. 1996). Therefore, the analysis of Ms. Funayama's Title VII claim applies with equal force to her PHRA claim, except for statute of limitations purposes, as described herein.

Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061 (2002). Discrete acts include termination, failure to promote, denial of transfer, or refusal to hire; each of these acts is an incident of discrimination that "constitutes a separate actionable 'unlawful employment practice'" and must therefore fall within the applicable limitations period. Id. at 114.

When a plaintiff alleges not one discrete act, but a period of discriminatory behavior, her claim is cognizable under the continuing violation theory. Under this theory, discriminatory acts may be aggregated to make out a hostile work environment claim. See O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006) (citing Morgan, 536 U.S. at 113). "When a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time-barred." Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991). Three factors distinguish continuing violations from isolated acts of discrimination: (1) the subject matter of the acts, meaning whether they involve the same type of discrimination; (2) frequency, meaning whether they are recurring or isolated; and (3) a degree of permanence that should "trigger an employee's awareness of and duty to assert his or her rights." Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 482 (3d Cir. 1997) (citing Berry v. Board of Supervisors of Louisiana State Univ., 715 F.2d 971, 981 (5th Cir.1983)); see also Shenkan v. Potter, 71 Fed.Appx. 893, 895 (3d Cir. 2003).

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Morgan, 536 U.S. at 115, 122 S.Ct. 2061. To state a claim for hostile work environment, a plaintiff must prove: (1) the plaintiff suffered intentional

discrimination because of her disability, gender, or age; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability. Cardenas, 269 F.3d at 260. "[H]arassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'" Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990) (internal citation omitted).

To determine whether discrimination is sufficiently hostile to create employer liability, a reviewing court must look at the totality of the circumstances, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367 (1993)). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Mufti v. Aarsand & Co., Inc., 667 F. Supp. 2d 535, 545 (W.D.Pa. 2009) (citing Abramson v. William Paterson College of New Jersey, 260 F.3d 265 (3d Cir. 2001)). Even conduct that is unquestionably offensive and rude will not rise to the level required to make out a hostile work environment claim unless it is sufficiently severe.[7]

---

[7] Courts are required to review hostile work environment claims using an objective standard. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68-69, 126 S.Ct. 2405 (2006) ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." (emphasis in original)).

To determine whether a plaintiff has provided evidence to support a hostile work environment claim under the continuing violation theory, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." <u>Morgan</u>, 536 U.S. at 120. That means this Court must consider first whether the acts Ms. Funayama complains of were sufficiently serious to create a hostile work environment; second, whether they were related enough to constitute a continuing violation; and third, whether one of the acts falls within the statutory time period. Because Ms. Funayama has failed to demonstrate the existence of a hostile work environment, this Court's analysis need only go so far as the first of these three steps.

Ms. Funayama filed a Charge of Discrimination with the EEOC on May 28, 2008. Because filing a timely charge is a prerequisite to having an actionable claim, Ms. Funayama must be able to show that discriminatory practices that were part of a hostile work environment took place within 180 days of this date for purposes of her PHRA claim and within 300 days of this date for purposes of her Title VII claim.

As set forth above, hostile work environment claims require a showing of repeated conduct. <u>Morgan</u>, 536 U.S. at 115, 122 S.Ct. 2061. To state a claim for hostile work environment, a plaintiff must prove, among other things, conduct that is pervasive and regular and which would have detrimentally affected a reasonable person of the same protected class in that position. <u>Cardenas</u>, 269 F.3d at 260. To determine whether discrimination is sufficiently hostile to create employer liability, a reviewing court must look at the totality of the

circumstances, including factors such as the frequency of the conduct, its severity, whether it is physically threatening or humiliating and whether it unreasonably interferes with an employee's work performance.  See Weston, 251 F.3d at 426.

Even assuming Ms. Funayama has met the first element of the test for a hostile work environment claim, she has failed to satisfy her burden on the second and fourth steps, requiring her to show that she suffered severe and pervasive harassment creating an objectively abusive working environment.  In reaching this conclusion, I consider the totality of the circumstances, including whether the conduct directed at her was frequent, whether it was physically threatening or humiliating or simply offensive, and whether it reasonably interfered with Ms. Funayama's work performance.  During the period from 1999 to 2001, Mr. Kuboniwa once kissed Ms. Funayama against her will, at the end of an evening during which the two had dinner and drinks socially, and once suggested that they share a hotel room.  The next allegedly harassing incidents did not occur until 2003, when Mr. Kuboniwa gave Ms. Funayama a novel she claimed was sexually explicit; arose from his bed without pants when she arrived at his house to deliver medicine as a personal favor; and then arranged a company dinner at a Hooters restaurant.  Ms. Funayama does not allege, in connection with any of these incidents, sexual comments or gestures, or even insults directed at her.  She admits that she reported Mr. Kuboniwa's conduct only once up to this time, and that he responded positively and respectfully when she told him she was not interested in dating him.  It was not until 2008[8] that Mr. Kuboniwa made another

_____

[8] Ms. Funayama also alleges one incident each in 2006 and 2007, but neither were remotely sexual in nature.  As set forth herein, one comment was directed at her becoming "Americanized" and the other was a work-related comment from Mr. Ujike regarding what he found to be an inappropriate remark on her work self-assessment.  Neither of these incidents can be interpreted to contribute to a hostile work environment claim under Title VII.

sexual remark, and while it was undoubtedly inappropriate for him to comment that her body was sexy, this remark was isolated from others similar to it by a period of years, and it was not of an objectively lewd or offensive nature. Ms. Funayama's allegations concerning the sexually explicit material delivered to her by Mr. Kuboniwa do not support a hostile work environment claim. Ms. Funayama alleges that Mr. Kuboniwa gave her a sexual novel in 2003 and a general interest magazine containing one sexually explicit story in 2007. She did not testify that Mr. Kuboniwa made any comments about either when he gave them to her. It stands to reason that even under Ms. Funayama's version of the facts, Mr. Kuboniwa was unaware of the extent of the sexual nature of either the book or the magazine.

In Ms. Funayama's response to the defendants' motion for summary judgment, she argues that, after Mr. Kuboniwa kissed her in 1999, he "continued to ask her out [and] groped her on the sides of her breasts under her armpits[.]" Funayama Resp. 5. During her deposition, however, she admitted that he never asked her out after 2003. With respect to the touching or groping, Ms. Funayama's allegation that Mr. Kuboniwa groped her breasts or near her breasts on a regular basis from 2003 until 2008 is not entitled to a presumption of truthfulness. Ms. Funayama

_____

Ms. Funayama also submitted a number of emails sent by various other Nichia employees, apparently in an attempt to provide support for her claim that Nichia fostered a sexually harassing atmosphere. The evidence she provides simply does not do so. Without addressing each of her exhibits, I note that she cites emails from Dan Doxsee to other Nichia employees introducing new employees and including among general personal information references to their homes or nationalities. See Funayama Ex 19. Without more, these emails provide no support for her claims. She also cites an email in which she claims Mr. Kuboniwa engages in gender stereotyping by calling the wife of the owner of a Chinese restaurant a "scary sister or chick." Id. She claims this comment evidences Ms. Kuboniwa's assumption that the owner of the restaurant couldn't possibly be a female. It goes without saying that Ms. Funayama's characterization of his comment is both baseless and irrelevant to her sexual harassment claim.

expressly admitted that Mr. Kuboniwa at no time touched her breasts from 2003 to 2008 and that, if he had done so, she would have reported it. The incidents of slight touching alleged by Ms. Funayama also do not rise to the level of harassment - these were brief encounters, Ms. Funayama did not ask Mr. Kuboniwa to stop, and she did not consider them worthy of reporting. Ms. Funayama stated that this touching was not accompanied by sexually suggestive language and that, instead, she assumed Mr. Kuboniwa did it for sexual gratification of some kind.

In sum, Ms. Funayama alleges that harassing incidents took place four times in the four year period from 1999 to 2003, and that, during this period of time, Mr. Kuboniwa also would ask Ms. Funayama out on dates. She acknowledges that he stopped asking her out in 2003, and she alleges that, from 2003 until she stopped working for Nichia in 2008, Mr. Kuboniwa occasionally touched her side (but not in a way offensive enough for her to report it), once gave her a general interest magazine containing a sexually explicit story, and once made an off-color remark about her body.[9] Ms. Funayama simply has not demonstrated that a genuine issue of fact exists as to whether Nichia created a hostile work environment. She fails to show conduct which is sufficiently severe or sufficiently pervasive. Finally, and perhaps most importantly, I note that Ms. Funayama herself dispels any notion that the conduct which she in retrospect found so offensive compelled her to resign. When questioned, she repeated that sexual harassment was not the reason she left Nichia.

Many courts in this circuit and others, faced with evidence of conduct more frequent and

---

[9] This case is comparable to Dreshman v. Henry Clay Villa, 733 F. Supp. 2d 597 (W.D.Pa. 2010), where the court granted summary judgment in favor of defendants where the majority of the claimed incidents of harassment happened years before the plaintiff stopped working for the defendant, and where offensive touching took place on scattered occasions during the course of plaintiff's ten and a half years' employment with the defendant.

more offensive than that alleged by Ms. Funayama, have granted summary judgment in favor of employer defendants.  See, e.g., Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-440 (E.D.Pa. 2001) (finding that defendant's repeated making of suggestive sexual comments, patting plaintiff on the buttocks and breast, and making harassing comments about plaintiff's family background and poverty were not sufficient to state a claim for hostile work environment); McGraw v. Wyeth-Ayerst Labs., Inc., No. 96-5780, 1997 WL 799437 at *5-6 (E.D.Pa. 1997) (finding that a supervisor's repeated requests for a date with the plaintiff, and one incident where he kissed her and touched her face did not rise to the level of severity required for a hostile work environment claim).  In those cases where courts have found a genuine dispute foreclosing summary judgment, the facts alleged are far more egregious than those in this case.  See e.g., EEOC v. Rose Casual Dining, L.P., No. 02-7485, 2004 WL 614806 at *4 (E.D.Pa. Mar. 5, 2004) (plaintiffs alleged "numerous specific instances of lewd behavior, extremely vulgar language, propositions to engage in sexual acts, inappropriate physical contact, and comments about [one plaintiff's] sexual orientation."); Harley v. McCoach, 928 F.Supp. 533, 536 (E.D.Pa. 1996) (defendants' sexually offensive conduct was "constant," in that "[w]orkers were always grabbing each other in offensive ways, tongueing each other's ears, eating danish pastries in ways that simulated oral sex, 'humping' each other (one man pressing his pelvis against another man's buttocks to simulate a sexual act), telling sexually oriented jokes, making sexually oriented comments to and about each other, using profanity, openly displaying sexually oriented magazines and a host of other offensive activities.").

Nichia's motion for summary judgment on Ms. Funayama's hostile work environment sexual harassment claims under Title VII and the PHRA, and her aiding and abetting claim

against Mr. Kuboniwa, is granted. Ms. Funayama's cross-motion for summary judgment on the same claims is therefore denied.[10]

---

[10] In her motion for summary judgment, Ms. Funayama makes a number of unfounded accusations against defendants. The evidence she presents in support of these accusations is often completely unrelated to the substance of her claims and, even when related, does not meet the evidentiary burden that she faces in order to win on summary judgment and does not create a genuine factual dispute precluding summary judgment in favor of defendants. I will refrain from addressing many of these exhibits and accusations other than to note that they have been reviewed and do not support Ms. Funayama's claims. See e.g., Funayama Ex. 24 (purporting to show that another Nichia employee, Asako Miyata, worked without compensation for a two month period); Ex. 34 (an email from Tadashi Fujikura to Ms. Funayama purportedly asking her for the dates of birth of company employees, without any other context or commentary); Ex. 42 (a deposition excerpt regarding the way in which another employee, Debbie Masinos, applied for a position with Nichia).

Ms. Funayama also cites a number of self-translated emails, which are relevant to her employment but do provide evidence supporting her hostile work environment claims. Among them is an email purportedly from Kuboniwa to Ms. Funayama and two other Nichia employees directing them to attend a screening of a video sent from Nichia Japan and stating, "I regret to say that the video is not an erotic adult video." Funayama Ex. 74. Aside from the obvious problem that the exhibit has not been officially translated, even assuming Ms. Funayama's translation is correct, this does not rise to the level of objectively severe harassing conduct sufficient to support a hostile work environment claim. It is the only email of its kind and it is not sexually explicit or directed to any one employee. Similarly, Ms. Funayama attaches emails showing that Nichia needed to educate its employees about its sexual harassment policy and looked to the policies of other companies in considering amendments to its own policy. See Funayama Ex. 40. This is simply not evidence that Kuboniwa or anyone else at Nichia affirmatively engaged in harassment.

Finally, I note that, in support of her argument that the harassment Ms. Funayama endured negatively affected her and would have negatively affected an objectively reasonable person, she relies on medical records from Hershey Medical Center for the proposition that the harassment "caused her significant physical and mental problems" and that she "had a mini heart attack." Funayama Mot. For Summary J., 17; Funayama Ex. 75. This statement is patently false. Her medical assessment does not link her medical condition to the work environment at Nichia and states that "your condition does not seem serious and your pain does not appear to be coming from your heart." Ex. 75.

**B.** **Disparate Treatment Age, Gender, Race & National Origin Discrimination In Violation of the ADEA, Title VII, and the PHRA; Retaliation in Violation of the ADEA, Title VII, and the PHRA**

Ms. Funayama also claims that she was discriminated against in connection with Nichia's decision not to transfer her to the Detroit office when Nichia's Mountville plant closed and with its decision "not to provide her with [Mr.] Ujike's position upon his resignation." Am. Compl. ¶ 61. She claims this treatment constituted gender discrimination in violation of Title VII and the PHRA (Am. Compl. Counts III and IV), age discrimination in violation of the ADEA and the PHRA (Counts V and VI), and race and national origin discrimination in violation of Title VII and the PHRA (Counts VII and VIII). Ms. Funayama also argues that this conduct constituted a constructive discharge, and that it was in retaliation for her contact with the EEOC. Id. at Counts IX - XII.

Defendants assert that Ms. Funayama has not made out a *prima facie* case of discrimination and that, even assuming she has, she has no factual support demonstrating that legitimate business considerations were not the reason for Nichia's staffing decisions.

Title VII prohibits employment discrimination on the basis of gender. 42 U.S.C. § 2000e-2(a)(1). A plaintiff asserting a Title VII discrimination claim under the pretext theory may proceed using the now-familiar three step burden shifting framework set forth in McDonnell Douglas.[11] See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir.1999). Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. Under this approach, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or

---

[11] McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). Once the plaintiff establishes a prima facie case of discrimination, the burden of persuasion shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged decision. Id. If the defendant succeeds, the burden returns to the plaintiff to show that the employer's stated reason for termination was merely a pretext for intentional discrimination. Id.

A plaintiff asserting a Title VII claim may also proceed under a mixed-motives approach and argue that the employer made the challenged employment decision for both legitimate and discriminatory reasons. See id. at 214-215. Though representing herself *pro se*, Ms. Funayama has presented coherent briefing including citations to relevant law in support of her positions. She advances her Title VII case under the McDonnell Douglas burden shifting standard.

The ADEA prohibits an employer from discharging or otherwise discriminating against an individual because of that individual's age. 29 U.S.C. § 623(a)(1). To establish a disparate treatment claim under the ADEA, a plaintiff must prove that age was the "but-for" cause of the defendant's adverse decision. Gross v. FBL Financial Services, Inc., - - U.S. - -, 129 S.Ct. 2343, 2350 (2009) (a plaintiff must prove by a preponderance of the evidence, which may be direct or circumstantial, that age was the "but-for" cause of the challenged employer decision). The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision. Id. at 2352. Shifting the burden of persuasion to the defendant is improper because the plain language of the ADEA requires the plaintiff to prove that the

defendant took the adverse employment action "because of [the plaintiff's] age." Id. at 2350-51

(quoting 29 U.S.C. § 623(a)(1)). Therefore, the mixed-motive framework available to Title VII

plaintiffs is not available in the ADEA context. See DeAngelo v. Dentalez, Inc., 738 F. Supp. 2d

572, 578 (E.D.Pa. 2010).

To establish a *prima facie* case of retaliation, a plaintiff must show that she engaged in

protected activity, that the employer took an adverse employment action against her, and that

there is a causal connection between the protected activity and the adverse employment action.

Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 323 (3d Cir. 2000) (citing Woodson

v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)). "[A] plaintiff making a retaliation claim

can satisfy the second element by showing 'that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination.'" Nagle v. RMA, The

Risk Management Ass'n, 513 F.Supp.2d 383, 390 (E.D.Pa. 2007) (citing Burlington Northern,

548 U.S. at 68).

"In order to establish a constructive discharge, a plaintiff must show that the employer

knowingly permitted conditions of discrimination in employment so intolerable that a reasonable

person subject to them would resign." Cardenas, 269 F.3d at 263 (internal citation omitted). The

resignation is treated as an outright dismissal, rendering it an adverse employment action which

can serve as the basis for a discrimination or retaliation claim. Riding v. Kauffman's Dept.

Store, 220 F. Supp. 2d 442, 463 (W.D.Pa. 2002).

It is not uncommon for discrimination, retaliation, and constructive discharge claims to

overlap where a plaintiff alleges an employment action short of discharge that was in retaliation

for complaining about discrimination and which renders working conditions intolerable. See Riding, 220 F. Supp. 2d at 463; see also Glenn v. Horgan Bros., Inc., No. 09-6578, 2005 WL 1503428 at *5 (E.D.Pa. June 24, 2005). In this situation, the reviewing court will initially have to determine whether the plaintiff has indeed presented sufficient evidence to show that the employment action taken was a tangible adverse action. In determining whether the plaintiff has met this burden,

> [t]here is an *objective threshold* that must be crossed, prima facie, by plaintiff in each case: the employer's action which forms the factual foundation of each claim *must work some serious and substantial tangible harm,* which alters an employee's compensation, terms, conditions or privileges of employment, and, in the case of a claimed constructive discharge, makes working conditions *so unpleasant* or intolerable that a *reasonable person in the employee's shoes* would resign.

Riding, 220 F. Supp. 2d at 463 (emphasis in original).

In its motion for summary judgment, defendants argue that Ms. Funayama has failed to state a prima facie case of employment discrimination in violation of Title VII, the ADEA, and the PHRA. Nichia does not dispute that Ms. Funayama is a member of a protected class under Title VII and the ADEA, or that she was qualified for her position. Defendants attack her prima facie case on the ground that she did not suffer an adverse employment action. To satisfy this element, the alleged adverse employment action must be sufficiently severe such that the compensation, terms, conditions, or privileges of the plaintiff's employment were altered, or she was deprived of employment opportunities or her status as an employee was otherwise adversely affected. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-1297 (3d Cir. 1997), abrogated on other grounds by Burlington Northern, 548 U.S. 53; see also 29 U.S.C. § 623(a); Cardenas, 269 F.3d at 263.

Although the type of adverse employment action that satisfies this standard is often one that results in economic injury, the Supreme Court has explained that tangible adverse employment actions also include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257 (1998) (an employment action is not materially adverse if it merely bruises the ego, results in a demotion without change of pay, benefits, duties, or prestige, or leads to a merely inconvenient reassignment). When a plaintiff alleges that a lateral transfer constituted a materially adverse employment action, that plaintiff does not show actionable injury "unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of [] employment . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncracies of personal preference are not sufficient to state an injury." Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999) (cited in Fallon v. Meissner, 66 Fed. Appx. 348, 351 (3d Cir. 2003)).

The Third Circuit has stated that "direct economic harm," though an important indicator of a tangible adverse employment action, is not "the *sine qua non.* If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 153 (3d Cir. 1999). In Torre v. Casio, the Third Circuit found a material issue of fact concerning whether a transfer to a new position constituted an adverse employment action where the plaintiff presented evidence that the "new" position to which he had been transferred had already been eliminated, because the employer had, prior to plaintiff's

-32-

transfer, already determined that there would not be sufficient sales volume to fill it. 42 F.3d 825, 831 n.7, 834-35 (3d Cir. 1994). In <u>Hampton v. Borough of Tinton Falls Police Dep't</u>, the Third Circuit found that there was evidence creating a genuine dispute that plaintiff had suffered an adverse employment action where he remained for over a year in a less-desirable position that was supposed to have been temporary. 98 F.3d 107, 115-16 (3d Cir. 1996)

For the reasons set forth below, I find that Defendants are correct in arguing that there is no evidence of an adverse employment action in Nichia's decision to offer Ms. Funayama a job in Detroit. The evidence does not create an inference of discrimination arising from Nichia's initial offer of the position to Mr. Ujike, as it had legitimate non-discriminatory reasons—his advanced degree, higher position in the company, and better relationship with Nichia's parent company in Japan—for doing so. The evidence clearly indicates that not all members of Nichia's Accounting Department in Mountville were to be transferred to Detroit. Ms. Funayama was effectively to be laid off. But, more importantly, any inference of discrimination disappears because Nichia then offered Ms. Funayama a position. Common sense tells us that an employer intending to exclude an employee on the basis of her age or gender will not offer that employee a position when one becomes available.

Therefore, Ms. Funayama has established a prima facie case if she can demonstrate that the position offered to her represented such a substantial change in the terms or conditions of her working environment that it constituted a tangible adverse employment action. While she cites <u>Torre</u> for the proposition that transfer to a "dead end" job constitutes a material adverse employment action, she has failed to present the kind of evidence the plaintiff in <u>Torre</u> did, meaning she has failed to show that the position offered to her in Detroit was a dead end job.

Neither has she provided the kind of evidence proffered by the plaintiff in <u>Hampton</u> - she has no concrete evidence that the position in Detroit to which defendants offered to transfer her was transitional or temporary, and she resigned before taking it.

First, Ms. Funayama has failed to show that the position she was offered in Detroit signified a material loss of benefits or reduction in salary. Had Ms. Funayama accepted the position in Detroit, her salary would have increased from $62,000 to $80,000. Funayama Ex. 21, Def.'s Answers and Objections to Pl.'s First Set of Interrogatories, ¶ 7. Although Ms. Funayama accuses Nichia of fabricating this evidence, she appears to concede that her salary and benefits would have remained at least identical had she accepted the position offered to her in Detroit. Funayama Mot. Summary J., 19 ("In this case, although [Plaintiff's] salary and benefits assumedly remained identical after her demotion . . . [Plaintiff] has provided significant evidence that her transfer from Financial Manager . . . to [a] clerk-level [position] . . . constituted a material adverse job action."). <u>Id.</u> She has offered no evidence that Nichia's response was a fabrication, so she must provide other evidence that, had she accepted the job offer in Detroit, it would have resulted in serious tangible harm altering the terms, conditions, or privileges of her employment. <u>See</u> <u>Burlington Industries</u>, 524 U.S. at 749. She argues, however, that two aspects of the job offered to her rendered it a demotion: first, its significant reduction of her responsibilities, and second, its transitional nature.

In support of this claim, Ms. Funayama alleges that, pursuant to the organizational chart presented at the June 25, 2008 meeting, she was to go from Mr. Marshall's manager to his equal. Funayama Mot. Summary J., 19 ("Although Funayama . . . was the manager of Marshall, after the demotion she was required to report to Kuboniwa parallel (same level) to Marshall."). A

careful review of the chart shows that duties formerly assigned to Mr. Ujike were to be distributed to Ms. Funayama and to Mr. Marshall. Very few of Ms. Funayama's original duties were changed under the chart, and only one of her duties was made Mr. Marshall's responsibility after originally being assigned to Ms. Funayama.[12] Therefore, her argument that her job responsibilities had been shifted from the handling of "supervisory/managerial and analytical tasks to clerk-level repetitive duties" appears to lack a basis in fact, because so many of her duties remained exactly the same. Only where there is evidence to support an employee's claim that she was demoted or transferred to a *substantially* less desirable position, has that employee created a genuine dispute as to whether there was an adverse employment action. Compare Lebofsky v. City of Philadelphia, No. 06-5106, 2009 WL 1507581 at *7-8 (E.D.Pa. May 29, 2009) (finding that plaintiff's transfer was not a *de facto* demotion where he claimed that he was given less desirable and less significant work responsibilities, denied a secure place in his employer's organizational structure, and lost his old office) *aff'd* 394 Fed.Appx. 935 (Sep. 17, 2010) with Czekalski v. Peters, 475 F.3d 360, 364-365 (D.C. Cir. 2007) (finding that a "lateral transfer" may have constituted an adverse employment action where the plaintiff went from supervising almost one thousand federal and contract employees in a program with a $400 million budget to supervising fewer than ten employees in a department with little-to-no budget of its own) and Ridley v. Costco Wholesale Corp., No. 04-3860, 2005 WL 2562726 at *2-3 (E.D.Pa. Oct. 12, 2005) (finding genuine dispute about adverse employment action where

---

[12] Some of Ms. Funayama's preferred evidence supports the position of Nichia. For example, she includes among her exhibits an email Mr. Ujike sent to her on June 4, 2008, in which he requests that a "manifest form" be sent to Ms. Funayama because she is in charge of taxation. See Funayama Ex. 49. Pursuant to the schedule of job duties for Detroit, Ms. Funayama was to remain responsible for the verification of tax returns and tax payments.

plaintiff was advised that he had been demoted from merchandise manager to front-end manager, resulting in a decrease in annual compensation from $54,000 to $37,000) *aff'd* 217 Fed.Appx. 130 (Feb. 5, 2007). Ms. Funayama has simply failed to provide any evidence that the position she was offered in Detroit so materially altered her benefits, responsibilities, or duties that it can properly be characterized as an adverse employment action.

Ms. Funayama similarly fails to offer any evidence that the position she was offered in Detroit was a transitional one. The facts of record do not indicate that Ms. Funayama was only offered a transitional position in Detroit. The organizational chart presented at the June 25, 2008 meeting, Mr. Kuboniwa's testimony, and Ms. Funayama's testimony all reflect otherwise. The organizational chart set forth a job schedule for Ms. Funayama and other employees that addressed permanent, not transitional duties. Mr. Kuboniwa stated that Ms. Funayama was selected immediately after Ujike resigned because Nichia needed a Japanese speaker in the accounting department, and did not indicate that because Mr. Ujike's position may have been transitional, Ms. Funayama's would be as well. Ms. Funayama stated that when she was first offered a position in Detroit, she was dissatisfied not because it was transitional, but because she was not immediately informed of the exact title and compensation of the new position. In her papers, she argues that the new position was a demotion not because it was transitional but because it placed her on equal footing with a former subordinate. Ms. Funayama's recounting of the conversation she had with Mr. Kuboniwa in which he stated that Nichia would bring on a man from Japan to handle the accounting department does not provide evidence in support of her claim. She claims this conversation took place in early May, 2008, *before* she was offered the position in Detroit. Even if it were true at the time, Nichia's subsequent actions show that

replacing her with a Japanese male was not its intent.

In her response to defendants' motion, Ms. Funayama argues that Nichia's characterization of her job duties understates her important role in the company. She cites her own academic background and her own characterization of her duties at the company in support of her claim that Nichia's attempt to challenge her credentials in comparison to Mr. Ujike's is improper and lacks a basis in fact. See Funayama Resp., 12-14. She then appears to argue that because Mr. Ujike was only offered a transitional position, this makes Nichia's argument that it had a legitimate reason for offering him the position in Detroit "moot." Id. at 14. Despite my best efforts to understand Ms. Funayama's line of reasoning, I fail to do so.[13] Ms. Funayama's claim is supported only if she can show that the position she was offered was truly a demotion or a temporary one. Although Ms. Funayama elsewhere makes the argument that her position was transitional, she also appears to claim, simultaneously, that it was *because* Mr. Ujike's position was transitional that Nichia cannot argue that he was more valuable than Ms. Funayama. The only way this argument makes sense is if Ms. Funayama believes that Nichia offered her a permanent position and Ujike only a temporary one, exposing that it viewed her as being more valuable than Ujike. In any event, Ms. Funayama's subjective belief in her own value to the company is irrelevant if she fails to show that she suffered an adverse employment action when she was offered a position in Detroit.

The evidence also demonstrates that Ms. Funayama began her search for another job before the schedule of new job duties was presented. In fact, all the steps required for her to

---

[13] I note again that, as set forth *infra*, Ms. Funayama was offered a position in Detroit immediately after Mr. Ujike resigned. This indicates that Nichia did not intend to exclude her from the company.

accept a new position—the posting of her resume on monster.com, her contact with a recruiter, and the recruiter putting her in touch with P&F USA—had been undertaken during June of 2008, and the meeting at which she was offered the position with Nichia she later characterized as a demotion did not take place until June 25, 2008. In other words, Ms. Funayama clearly began to actively seek new job opportunities *after* she was offered a position with Nichia in Detroit but *before* she had learned of the nature of her duties there. Finally, her own characterization of her decision to resign from employment with Nichia suggests that she was undergoing stress because of the uncertainty created by Nichia's move to Detroit. She testified that it was while she was contemplating quitting or going to Detroit that she learned of the employment opportunity with P&F, which she viewed favorably and ultimately accepted.

I note that Ms. Funayama argues that Mr. Kuboniwa's deposition testimony provides evidence in support of her claim that her alleged demotion was in retaliation for her filing an EEOC complaint. Again, her assertion lacks a factual basis:

> Q:  What did you consider or what was on your mind between May 28th and June 25th about plaintiff's position to be in Detroit?
>
> A.  I have no idea at that time because I received notice from [EEOC] that you filed. That is May 30th. So from that time I cannot figure out what's going to happen. So I waited.
>
> Q:  So did plaintiff's [EEOC] filing affect your decision making process?
>
> A:  That doesn't affect to me. That is just I waited the next step. It means just you've hired, that's all.
>
> Q:  But that has nothing to do with the transfer decision.
>
> A:  That's correct, yes.
>
> Q:  So what did you have to wait to make next decision?
>
> A:  What are you going to complain, that I don't know. I didn't know.
>
> Q:  You didn't know anything. So what did you have to wait and think to decide on the detail of my position in Detroit?

. . . . .

Q:   On June 25th job sheet was provided by. But why did you not
     give me my title, my new salary, and other details, reporting
     structure, such and such?

A:   Those are not decided at that time.

Kuboniwa Dep. Session 2, 93:20-95:6. In his testimony, Mr. Kubonwa affirmed that Ms.

Funayama's filing a complaint with the EEOC did not affect his decision-making process, and

that he had no idea how the complaint would be resolved.

Ms. Funayama has presented insufficient evidence to show that she suffered an adverse

employment action. Though she was initially laid off from her position, she was immediately

offered a position when another individual resigned. She fails to demonstrate that the position

she was offered was a demotion or that it was transitional in nature. Under the slightly different

standard applicable for her retaliation claim, she has failed to show that there was an adverse

employment action that would have dissuaded a reasonable worker from making or supporting a

charge of discrimination. Ms. Funayama filed her first charge with the EEOC on May 28, 2008.

She was offered a position in Detroit a few days later, and was given the details of the position

on June 25, 2008. She filed her retaliation claim on July 1, 2008. Clearly she was not dissuaded

from filing a second charge due to the nature of the job offer in Detroit, and she has not

demonstrated that a reasonable person would have been dissuaded. The evidence shows that she

resigned her employment with Nichia instead of accepting the position in Detroit because of

stress and because another employment opportunity arose. As the Third Circuit has stated:

> [T]he law does not permit an employee's subjective perceptions to govern a
> claim of constructive discharge. Every job has its frustrations, challenges and
> disappointments; these inhere in the nature of work. An employee is
> protected from a calculated effort to pressure [her] into resignation through
> the imposition of unreasonably harsh conditions, in excess of those faced by

> [her] co-workers. [She] is not, however, guaranteed a working environment
> free of stress. The employment discrimination laws requires as an absolute
> precondition to suit that some adverse employment action have occurred.
> They cannot be transformed into a palliative for every workplace grievance,
> real or imagined, by the simple expedient of quitting.

Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) (quoting Bristow v. Daily

Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89

L.Ed.2d 718 (1986). It is Ms. Funayama's subjective perceptions that drive her discrimination,

retaliation, and constructive discharge claims. There is simply no evidence in the record that she

suffered an adverse employment action when she was offered a position with Nichia in Detroit.

Rather, the evidence reflects that Ms. Funayama was dissatisfied with Nichia's failure to

immediately answer her inquiries about the structure of a yet-to-be formed department, and later,

with being given substantially the same responsibilities she had in Mountville upon the move to

Detroit. Because Ms. Funayama must demonstrate that she suffered an adverse employment

action before moving forward with her disparate treatment, retaliation, or constructive discharge

claims, there is no need to address the remaining steps required in analyzing them.

Therefore, I will grant Nichia's motion for summary judgment on Ms. Funayama's Title

VII, ADEA, and PHRA discrimination, retaliation, and constructive discharge claims.


## MOTION TO AMEND COMPLAINT

Ms. Funayama sought leave to amend her complaint on November 12, 2010. See

Document No. 78. Specifically, she sought to add Nichia Japan as a party, to add additional

allegations of adverse employment actions, to add a civil RICO cause of action, and to add a

claim under the Equal Pay Act. See id. This Court already has denied Ms. Funayama's motion

to amend her complaint.  She subsequently filed two motions for reconsideration of this court's denial of her motion to amend.  The following is an attempt to fully address the issues raised in her motion to amend and to provide further reasoning for denial of her motions for reconsideration.

Whether to grant a plaintiff leave to amend a complaint is committed to the sound discretion of the trial judge.  Gay v. Petsock, 917 F.2d 768, 772 (3d Cir.1990) (citations omitted).  "A district court may deny leave to amend a complaint if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party.  Moreover, the court may deny a request if the movant fails to provide a draft amended complaint . . . or may refuse to allow an amendment that fails to state a cause of action."  Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001) (internal citations omitted).  Ms. Funayama's first motion to amend her complaint, which did not include a draft amended complaint, was properly denied on this ground alone.  More importantly, however, granting her motion to amend would have proved prejudicial to the opposing party and represented undue delay.  Delay is undue where a plaintiff attempts to replead facts which could earlier have been pleaded.  See Cureton, 252 F.3d at 273 (citing Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 654-55 (3d Cir. 1998)).  Leave to amend should also be denied where amendment will be futile.  In re Alpharma Inc. Securities Litig., 372 F.3d 137, 153 (3d Cir. 2004) (citing Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000)).


A.      Motion to Add Nichia Japan as a Party

Ms. Funayama sought leave to amend her complaint to add Nichia Japan as a party.  Ms.

Funayama presented no evidence at the time she sought to amend her complaint, and still fails to present any evidence, that she uncovered information rendering Nichia Japan liable for her claims this late in litigation so as to justify amendment. In other words, she has presented no evidence that her assertions, made under oath in her amended complaint, that she was "an employee of Defendant Nichia America Corporation" and was "hired by Nichia America in April, 1995," are no longer true. She does not claim that the corporate relationship between Nichia America and Nichia Japan was hidden from her at any point during her employment or during the pendency of this litigation. She failed to offer any explanation for her failure to file suit against Nichia Japan, and as Nichia America was her employer it appears there is no valid basis for this amendment.

**B.     Motion to Add Additional Adverse Employment Actions**

With respect to Ms. Funayama's motion to amend her complaint to add additional adverse employment actions, the actions she cites occurred during the time of her employment and were not hidden from her. She was therefore aware of them well before her resignation and well before discovery was completed. These actions included the transfer of Scott Ushida to Nichia America in 2000 and the transfer of Tim Ujike to Nichia America in 2003. Ms. Funayama would have been aware of these actions at the time they occurred and amending her complaint to add them as adverse employment actions following the completion of discovery represents undue delay that would cause prejudice to the defendants. Ms. Funayama also sought to add facts already pleaded regarding the promotion of Brian Marshall. It was proper to deny Ms. Funayama leave to amend on this ground.

## C.     Motion to Add Civil RICO Cause of Action

Ms. Funayama sought to add a claim against Nichia under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), citing section (c) of the Act, codified at 18 U.S.C. § 1962. Amendment on this ground would have been both prejudicial and futile.  As defendants pointed out in their response to plaintiff's motion, adding substantive claims would have forced defendants to incur substantial additional discovery and litigation costs and would have necessitated another re-opening of the discovery period in this case.

"To state a claim under section 1962(c), the plaintiff must allege that (1) a person conducted (2) an enterprise through (3) a pattern of (4) racketeering activity." Kolar v. Preferred Real Estate Investments, No. 07-3864, 2008 WL 2552860 at *4 (E.D.Pa. June 19, 2008) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  The RICO statute defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).  An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Id. § 1961(4).  Section 1962(c) requires that the RICO defendant is separate and distinct from the alleged RICO "enterprise."  Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir. 1991).  In the context of an allegation involving a corporate entity, a plaintiff asserts a valid claim under Section 1962(c) when she alleges that a corporate owner or employee who is distinct from the corporation itself "conducts the corporation's affairs in a RICO-forbidden way." Cedric Kushner Productions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087 (2001).  In such a situation, the owner or employee is the "person" and the corporation is the "enterprise."  Id. However, a claim that the corporation is the "person" and the corporation together with its

employees and agents is the "enterprise," will not withstand a motion to dismiss.  Id. at 164

(citing Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir.

1994)).  Similarly, a reference to the corporation as both the "person" and as the "enterprise"

within a complaint is a fatal defect.  See Zavala v. Wal-Mart Stores, Inc., 447 F.Supp.2d 379,

383-84 (D.N.J. 2006).

Ms. Funayama failed, in her motion to amend her complaint or in her later-filed proposed

amended complaints, to allege that a corporate owner or employee distinct from the corporation

itself conducted its affairs in a RICO forbidden way.  See Doc, No. 91, Count IXX.  Rather, Ms.

Funayama's allegations pertain to Nichia America and Mr. Kuboniwa as one; she makes no

effort to allege that Mr. Kuboniwa or any other employee is a RICO defendant separate and

distinct from a RICO enterprise.  Moreover, she provides in support of her RICO claim only

vague allegations, many of which are unrelated in any way to her employment with Nichia

America.[14]


### D.      Motion to Add Claims Under the Equal Pay Act

Finally, Ms. Funayama sought to add allegations that defendants violated the Equal Pay

Act.  Amendment on this ground would have been both prejudicial to defendants and futile.

To establish a prima facie case under the Equal Pay Act, Ms. Funayama would be

required to show that Nichia paid male employees more for performing equal work (i.e., "work

---

[14]  These included allegations that Mr. Kuboniwa traveled to Cuba illegally while an employee of Nichia America, allegations that another Japanese employee was not properly paid wages, and allegations that another Nichia employee's bonus was hidden  "to defraud the court and [the employee's] wife and children."

of substantially equal skill, effort, and responsibility, under similar working conditions"). <u>See</u> 29 U.S.C. § 206(d)(1); <u>EEOC v. Del. Dept. of Health & Soc. Servs.</u>, 865 F.2d 1408, 1413-14 (3d Cir.1989). If Ms. Funayama makes such a showing, the burden shifts to Nichia to demonstrate the applicability of one of the four affirmative defenses enumerated within the statutory text. These defenses include the existence of (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a system based upon any other factor other than sex (the "catchall defense"). <u>Wildi v. Alle-Kiski Medical Center</u>, 659 F. Supp. 2d 640, 658 (W.D.Pa. 2009) (citing <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196-97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Ms. Funayama failed to provide the names of the male employees she believes were paid more than her for performing equal work, and failed to make a prima facie showing that their work required the same skill, effort, and responsibility. After receiving defendant's opposition to her motion to amend, Ms. Funayama filed a proposed amended complaint in which she identified the male who she claims was paid more for equal work as Tim Ujike. <u>See</u> Document No. 91. As set forth in detail above, Ms. Ujike was identified as Ms. Funayama's supervisor on multiple occasions and was not viewed, by Nichia or by Ms. Funayama, as her equal during the time she was a Nichia employee.

### E.     Motions for Reconsideration

After Nichia filed a response to Ms. Funayama's motion to amend, she filed a proposed amended complaint in which she attempted to remedy the futilities identified in its response. She also filed two motions for reconsideration of this court's order denying her motion to amend. Allowing Ms. Funayama to file her amended complaint would have unduly protracted the duration

of this litigation, increased the expenses incurred by the defendants, and most importantly, would not have resulted in the addition of any viable claims. A motion for reconsideration should only be granted due to (1) an intervening change in the controlling law; (2) the availability of new evidence or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Café v. Quinteros, 176 F.3d 669, 678 (3d Cir. 1999). Ms. Funayama failed to satisfy any of these grounds. Her motions for reconsideration will be denied.


## MOTION TO STRIKE EXHIBITS

Nichia has filed a motion to strike exhibits filed by Ms. Funayama in support of her own motion for summary judgment and in opposition to Nichia's motion. Due to Ms. Funayama's *pro se* status and in an effort to resolve the pending motions for summary judgment without further delay, I considered all exhibits submitted by Ms. Funayama. Even viewing these exhibits and the facts in the light most favorable to Ms. Funayama, Nichia's motion for summary judgment is granted. Therefore I will deny the motion to strike as moot.


## CHILD EXPLICIT PORNOGRAPHY ALLEGATIONS

In her motion to amend her complaint filed after withdrawal of her counsel, Ms. Funayama sought to add allegations that Mr. Kuboniwa delivered "adult sexual material" to her during her September 15, 2009 deposition at the offices of counsel for the defendant. She appears to claim that the book was delivered along with other contents from her desk at Nichia's offices. She has pursued this claim relentlessly, seeking interlocutory appeal of this Court's decision to deny her leave to amend her complaint on this ground. See Document No. 61. As noted by Judge Perkin

in the R&R adopted by this Court, these allegations are unrelated to the employment

discrimination claims set forth in Ms. Funayama's amended complaint.  I feel compelled,

however, to address the content of this claim, since Ms. Funayama has attached, to her summary

judgment exhibit binder, copies of pages from the book she claims contains explicit, or

pornographic material.  See Funayama Ex. 53, Doc. No. 103.  The book to which she refers as the

"Brassai book" was forwarded, by defense counsel, to the Court on April 23, 2010.  In a letter to

the Court from counsel for defendants Rory Connaughton, which was carbon copied to Ms.

Funayama, Mr. Connaughton stated, "[i]nasmuch as Ms. Funayama's motions include allegations

with respect to the dissemination of pornography, I have enclosed for the Court's review a copy of

the book referenced in Ms. Funayama's motion."  The book sent to the Court by defense counsel

is in English; the copy from the first page of the book submitted by Ms. Funayama as an exhibit

appears to be in French.  However, a comparison of the pages sent by Ms. Funayama to pages in

the hard copy of the book sent by defense counsel reveals that the picture contents (at least with

respect to the images alleged by Ms. Funayama to be pornographic) are exactly the same.  The

book is entitled, in its English translation, as "The Secret Paris of the 1930's."[15]  The photographs

depicted in the book were taken by a Hungarian-born French photographer named Jules Halasz,

who went by the pseudonym Brassai and who was known primarily for his dramatic photographs

of Paris at night.[16]  The book is a photographic memoir containing photographs of Paris life in the

---

[15]  The copy of the book provided to the Court by defense counsel will be forwarded to
the Clerk of Court for docketing.

[16]  Brassai Definition, Encyclopedia Britannia online,
http://www.britannica.com/EBchecked/topic/77894/Brassai

1930's.

Ms. Funayama's allegation that this book and the photographs in it are obscene or pornographic is outlandish, inappropriate, and without any basis in fact. Under the three part test for obscenity set forth by the Supreme Court in <u>Miller v. California</u>, obscene material is material that, taken as a whole, appeals to the prurient interest in sex, portrays sexual conduct in a patently offensive way, and which, taken as a whole, does not have serious literary, artistic, political, or scientific value. <u>See</u> 413 U.S. 15, 24 93 S.Ct. 2607 (1973). In <u>New York v. Ferber</u>, the Court ruled that for material to constitute child pornography, it need not meet the test articulated in <u>Miller</u>. 458 U.S. 747, 764-765, 102 S. Ct. 3348 (1982). Rather, it adjusted the <u>Miller</u> formulation, finding that "[a] trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." <u>Id.</u> As far as the depiction of a child's genitals, criminalized under 18 U.S.C. § 2251-2259, the Third Circuit has stated that the criteria set forth in <u>United States v. Dost</u>, 636 F.Supp. 828, 831 (S.D.Cal.1986), should be used as a guide in determining whether such a depiction is lascivious and therefore constitutes criminal conduct. <u>See</u> <u>Doe v. Chamberlain</u>, 299 F.3d 192, 196 (3d Cir. 2002); <u>United States v. Villard</u>, 885 F.2d 117, 122 (3d Cir. 1989).[17] Under <u>Dost</u>, a court looks to the following factors:

---

[17] As noted by the Third Circuit in <u>Chamberlain</u>, "Congress has chosen to criminalize only photos of the genitalia or pubic areas and of these parts only when they are the subject of 'lascivious exhibition.' Only then do they qualify as 'sexually explicit conduct.'" 299 F.3d at 196 (citing 18 U.S.C. § 2256(2)(E)).

-48-

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
4) whether the child is fully or partially clothed, or nude;
5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

Dost, 636 F.Supp. at 832.

The pictures of nude women interspersed throughout "The Secret Paris of the 1930's" do not appeal to the prurient interest in sex and they do not portray sex in a patently offensive way. The book has serious artistic value and does not, under any stretch of the imagine, constitute obscene material or pornography. This Court's review of the book reveals only one photo of a nude child. That photograph, which appears in the chapter entitled "Street Fair," depicts a naked child standing next to a monkey dressed in a suit. The child's genitals are not the focal point of the photo, the setting is not sexually suggestive, the depiction absolutely does not depict sexual coyness, and it is clearly and unequivocally not intended to elicit a sexual response from the viewer.

In sum, the material Ms. Funayama so strenuously suggests is pornographic and sexually explicit is not so. While this Court has refused to allow Ms. Funayama to amend her complaint to add allegations with respect to this material, it is addressed here because Ms. Funayama continues to make baseless allegations against defendants with respect to it and because Ms. Funayama attached copies of relevant pictures to her motion for summary judgment.

## <u>CONCLUSION</u>

The defendants are entitled to summary judgment in their favor.  Ms. Funayama's cross-motion for summary judgment will be denied.  Her motions for reconsideration of this Court's order denying her motion to amend her complaint will be denied.  Defendant's motion to strike the exhibits submitted by Ms. Funayama in support of her motion is denied as moot.  An appropriate order follows.